Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| COMISIONADO DE SEGUROS DE PUERTO RICO<br><br>*Recurrido*<br><br><br>v.<br><br><br><br>MULTINATIONAL INSURANCE COMPANY<br><br>*Recurrente* | KLRA202400219 | Revisión Administrativa procedente de la Oficina del Comisionado de Seguros de Puerto Rico<br><br>Caso Núm.:<br>I-2024-05<br><br>Sobre:<br>Violación a la Carta Normativa Núm. CN-2019-248-D y al Art. 11.190 del Código de Seguros de Puerto Rico, 24 LPRA 1119(3) |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 4 de diciembre de 2024.

Comparece Multinational Insurance Company (MIC o parte recurrente), mediante recurso de *Revisión Judicial* presentado el 25 de abril de 2024, y nos solicita la revocación de la *Resolución Final* emitida y notificada el 27 de febrero de 2024, por la Oficina del Comisionado de Seguros de Puerto Rico (OCSPR o el Comisionado de Seguros). Por virtud de esta, la OCSPR confirmó la Orden Núm. I-2024-05 y la multa de diez mil dólares ($10,000.00) impuesta contra MIC por negarse a participar en un proceso de valoración.

Posteriormente, el 8 de marzo de 2024 y el 11 de marzo de 2024, MIC y el Departamento de Educación (DE), respectivamente, presentaron *Moción de Reconsideración*, las cuales no fueron atendidas por la OCSPR.

Por los fundamentos expuestos a continuación, **modificamos** la *Resolución Final* impugnada.

**I.**

La génesis del caso de marras surge como consecuencia del terremoto acontecido el 7 de enero de 2020 (siniestro) en Puerto Rico. En lo pertinente a la controversia trabada, un mes antes del siniestro, MIC y el DE suscribieron un contrato de seguro de propiedad comercial, cuyo número de póliza es 88-CP-000329920-0 (la póliza). El período de vigencia de la póliza era del 30 de diciembre de 2019 hasta el 30 de diciembre de 2020[1]. Las escuelas incluidas bajo la póliza son doscientas treinta y cuatro (234), y se encuentran desglosadas en el Endoso B. Por otro lado, en el Endoso A, se establece el deducible de la póliza. Para el 7 de enero de 2020, MIC emitió una carta de apertura de reclamación a favor del DE, esto, basado en que recibieron información sobre las escuelas afectadas por el siniestro a través de Jorge Díaz y, por ello, le notificaron al DE el número de reclamación[2]. Seguidamente, el 14 de enero de 2020, el DE sometió a MIC la Notificación de Pérdida de la Propiedad[3].

Así las cosas, MIC contrató los servicios del ajustador independiente McLarens Puerto Rico, LLC (McLarens) para llevar el proceso de investigación y ajuste de la reclamación, mientras que el DE se tardó tres años para contratar a CAT Adjusters Inc. (CAT)[4]. En enero y febrero de 2020, McLarens envió la solicitud de documentos[5] al DE. Además, McLarens alegó que la fecha de comienzo para realizar las inspecciones fue retrasada por la falta de acceso a los planteles, esto, debido a que el DE solicitó un relevo de responsabilidad. En consecuencia, el 9 de marzo de 2020, sin la comparecencia del DE, McLarens comenzó a realizar las inspecciones. Consecutivamente, el 11 de marzo de 2020, las

---

[1] Véase págs. 251-368 del recurso.
[2] Véase págs. 369-370 del recurso.
[3] Véase pág. 696 del recurso.
[4] Véase págs. 163-180 y 187-203 del recurso.
[5] Véase págs. 697-698 del recurso.

inspecciones fueron paralizadas cuando el Gobierno de Puerto Rico emitió restricciones en respuesta a la emergencia de salud pública creada por el COVID-19. No obstante, para el 31 de agosto de 2021, McLarens notificó al DE que inspeccionó todas las escuelas cobijadas por el Endoso B, así también le informó al DE sobre los hallazgos finales[6], los cuales surgieron como resultado de las inspecciones realizadas. El 4 de febrero de 2022, McLarens entregó al DE un informe sobre su reclamación mediante una presentación de un "Power Point[7]". De esta, surge que, de doscientos treinta y cuatro (234) planteles escolares bajo reclamación, once (11) escuelas habían sido rechazadas. De las restantes doscientas veintitrés (223) escuelas, doscientas once (211) contaban con una carta de respuestas, mientras doce (12) no contaban con dichas respuestas. Además, encontraron que hubo escuelas sin daños sísmicos, otras estaban bajo el deducible; para ese entonces, hubo trece (13) escuelas que contaban con cartas de propuestas de indemnización. Posteriormente, el 14 de abril de 2023, McLarens, modificó parcialmente su informe y notificó por medio de la carta de reserva.

En junio de 2023 se reunieron CAT y MIC. Este último, solicitó que se le proveyera los estimados de daños. El 22 de junio de 2023, McLarens recibió de parte de CAT un correo electrónico, el cual incluía un estimado de daños para seis (6) escuelas, a saber: Hipólito García Barrero, Luis Muñoz Rivera, José Rodríguez Soto y Anexo, Luis A. Ferré Aguayo, Magüeyes II y Arturo Lluberas. Ese mismo día, el DE remitió una carta a McLarens, en la que alegaban numerosas cosas, entre estas, adujo que MIC había infringido el Código de Seguros de Puerto Rico[8]. McLarens contestó la misma oponiéndose a lo expresado por el DE. Posteriormente, las partes trataron de

---

[6] Véase Carta del 7 de agosto de 2023, págs. 719-730 del recurso.
[7] Véase págs. 461-482 del recurso.
[8] 26 LPRA secc. 27.01 *et. seq.*

reunirse para discutir el análisis comparativo entre los estimados. El 18 de septiembre de 2023, McLarens y CAT se reunieron para discutir las diferencias entre los estimados de las seis (6) escuelas y calendarizar inspecciones. Días después, el 26 de septiembre de 2023, CAT confirmó las fechas de las inspecciones de las seis (6) escuelas. El 27 de septiembre de 2023, CAT notificó los estimados de daños para las diecinueve (19) escuelas adicionales y, el 2 de octubre del mismo año, se discutió cómo y cuándo se realizarían las inspecciones de las diecinueve (19) escuelas.

El 18 de octubre de 2023, el DE presentó ante el Comisionado de Seguros la solicitud de valoración, al amparo de la carta normativa CN-2019-248-D[9]. Por su parte, el 2 de noviembre de 2023, MIC se opuso y adujo que el DE no había cooperado al no entregar los documentos solicitados para investigar, evaluar su estimado de daños, por lo que, solicitó que se declarara prematura la valoración de daños[10]. El 3 de noviembre de 2023, el DE presentó un escrito intitulado *Notificación sobre Ausencia de Acuerdo para Selección de Árbitro/Solicitud para que el Comisionado proceda a Seleccionar Árbitro*[11].

El 11 de diciembre de 2023, la OCSPR abrió la investigación y le concedió hasta el 22 de diciembre de 2023 a MIC para producir la totalidad del expediente de reclamación. MIC pidió prórroga, la cual fue concedida. Ese mismo día, luego de haberse otorgado la prórroga a MIC, la OSCPR determinó a favor de la solicitud de valoración del DE. El 8 de enero de 2024, MIC solicitó a la OCSPR que notificara adecuadamente su determinación. En respuesta, el 17 de enero de 2024, la OCSPR dictó Orden contra MIC, reiteró su determinación del pasado 22 de diciembre de 2023, impuso una

---

[9] Véase págs. 246-247; 369-370 del recurso.
[10] *Íd.*, págs. 234-245 del recurso.
[11] *Íd.*, págs. 408-438 del recurso.

multa de cinco mil dólares ($5,000.00) por haber incumplido con el Artículo 11.190(3) y cinco mil dólares ($5,000.00) adicionales por infringir la Carta Normativa 2019-248 D.

Para el 7 de febrero de 2024 se había calendarizado vista administrativa, la cual no se pudo celebrar y las partes accedieron a presentar resolución sumaria simultáneas, a esos efectos, se les concedió hasta el 14 de febrero de 2024 para presentar mociones dispositivas y hasta el 21 de febrero de 2024 para presentar réplicas[12].

El 14 de febrero de 2024, MIC presentó *Moción de Resolución Sumaria*[13]. En síntesis, argumentó que para que se active el procedimiento de valoración instituido en la póliza, es necesario que se cumplan con las condiciones materiales de la póliza, entre estas, se encuentra: el deber del asegurado de asistir y cooperar en el trámite de la investigación; permitir al asegurador inspeccionar la propiedad cuantas veces sea razonablemente necesario. Con relación a la aplicación de la Carta Normativa Núm. CN-2019-248-D, esbozó que la misma contraviene la Carta Normativa N-OE-1993-5-58-93. Además, aun cuando <u>las veinticinco (25) escuelas en controversia cumplen con el requisito de reclamación</u>, esto es inoperante porque al DE no brindar la información requerida por MIC, convierte la valoración en una prematura. Arguyó que, la conclusión del Comisionado de Seguros es improcedente en derecho, porque afecta el contrato suscrito entre las partes. Expuso que la Orden del 17 de enero de 2024 del Comisionado de Seguros determinó que la reclamación presentada por el DE está madura para comenzar el proceso de valoración de veinticinco (25) de las doscientas veintitrés (223) escuelas incluidas en el Endoso B,

---

[12] *Íd.* pág. 225 del recurso.
[13] *Íd.* págs. 510-554 del recurso.

porque MIC realizó una oferta con respecto a ellas y el DE declinó y manifestó su inconformidad. Las veinticinco (25) escuelas son:

| | |
|---|---|
| Héctor I. Rivera | Dr. Manuel de la Pila |
| Luis Muñoz Rivera | Bellas Artes |
| José Rodríguez Soto y Anexo | Julio Collazo Silva |
| Luis A. Ferré Aguayo | Antonio Paoli |
| Magüeyes II | Felipe Colón Díaz |
| Arturo Lluberas | Elsa Cuoto Annoni |
| Hipólito García Barrero | Alfredo M. Aguayo |
| Herminio E. Arzola | Tallaboa Alta |
| Dalila Torres | Ismael Maldonado Lúgaro |
| Jorge L. Lucas | Fernando Luis Malavé |
| Ernesto Ramos Antonini | Andrés Grillasca Salas |
| Elvira Vicente | Luisa Monsegur (Barri Barina) |
| Benecia Vélez | |

MIC insistió que la falta de cooperación del DE ha provocado que la valoración esté inmadura en su totalidad porque ellos no han tenido la oportunidad de expresar su posición en cuanto a los estimados notificados entre junio y septiembre de 2023. Además, reclamó que de esas veinticinco (25) escuelas, solo seis (6) han sido inspeccionadas a la luz de los estimados de daños, y que el DE rehúsa permitir que se inspeccionen las restantes diecinueve (19) escuelas.

MIC, a su vez, cuestionó las imposiciones de multas. Razonó que no ha violentado disposición alguna del Código de Seguros de Puerto Rico, porque este nada dispone sobre la controversia de autos, entiéndase, cuando una reclamación de valoración está madura o no, por lo cual, penalizar a MIC por acudir a ese foro para dilucidar un asunto de derecho novel, es improcedente.

De igual forma, la Oficina del Comisionado de Seguros (OSC) en representación del DE, presentó *Solicitud de Resolución Sumaria*[14]. Esbozó que no existe controversia alguna sobre los

---

[14] *Íd.*, págs. 224-509 del recurso.

hechos materiales del caso. Asimismo, reiteró que la determinación del Comisionado de Seguros es la correcta. Enumeró diecinueve (19) hechos que no están en controversia, a saber:

1. Multinational es un asegurador debidamente autorizado por la OSC para contratar negocios de seguros en esta jurisdicción.
2. El 2 de noviembre de 2023, el asegurador presentó ante la OCS un escrito intitulado Oposición a Solicitud de Valoración, en adelante denominado "la Oposición", mediante el cual solicita que, a la luz de los fundamentos allí esbozados, se declare que es prematura la solicitud de valoración que le notificó el DE el 18 de octubre de 2023. Dicha solicitud de valoración, hecha al amparo de la carta normativa CN-2019-248-D, *supra*, en adelante denominada "la Carta Normativa", se refiere a la reclamación 332600 del DE contra Multinational, en adelante denominada "la Reclamación".
3. El 3 de noviembre de 2023, el DE presentó ante la OCS un escrito intitulado Notificación sobre Ausencia de Acuerdo para Selección de Árbitro/Solicitud para que el Comisionado proceda a Seleccionar Árbitro, en adelante denominado "la Notificación y Solicitud". Mediante este escrito, el DE solicitó que, de acuerdo a las disposiciones de la Carta Normativa, la OCS procediera a nombrar un árbitro neutral para presidir el proceso de valoración solicitado por el DE al Asegurador; ello ante la renuncia del asegurador a aceptar la petición del DE de iniciar el proceso de valoración.
4. La Reclamación surgió como consecuencia de los daños sufridos en ciertas escuelas del DE a consecuencia de los terremotos ocurridos el 7 de enero de 2020.
5. Las propiedades incluidas en la Reclamación estaban cubiertas bajo la póliza número 88-CP-020202329920-0, en adelante denominada "la Póliza", emitida por el Asegurador para estar vigente del 30 de diciembre de 2019 hasta el 30 de diciembre de 2020.
6. El Asegurador contrató los servicios del ajustador independiente McLarens Puerto Rico, LLC, en adelante denominado "McLarens", para llevar a cabo el proceso de investigación y ajuste de la Reclamación, mientras que el DE contrato los servicios de CAT Adjusters Inc., en adelante denominado "CAT", para representarle en dicho proceso.
7. El 18 de octubre de 2023, el DE, por conducto del Lcdo. Eric Rubén Huertas, sometió al Asegurador una petición para atender la Reclamación bajo el proceso de valoración dispuesto en la Carta Normativa.
8. El 31 de octubre de 2023, y ante la falta de respuesta del Asegurador, el DE envió, por conducto del licenciado Huertas, una carta de seguimiento al Asegurador.
9. El 2 de noviembre de 2023, el Asegurador presentó ante la OCS la Oposición.
10. En la propia Oposición, el Asegurador informó a la OCS, entre otras cosas, una tabla enumerando trece (13) escuelas cuyos daños fueron cuantificados superando el deducible dispuesto en la Póliza y para las cuales realizó oferta de pago al DE, en adelante denominado "la Tabla 1", así como otra tabla enumerando cuarenta y siete (47) escuelas cuyos daños fueron cuantificados por debajo del referido deducible, en adelante denominada "Tabla 2".
11. El 3 de noviembre de 2023, el DE presentó ante la OCS la Notificación y Solicitud, y el 1 de diciembre de 2023, sometió un escrito adicional en apoyo a la Notificación y

Solicitud que incluyó veinticinco (25) informes o estimados de inspección, en adelante denominados "los Informes", realizados por CAT.

12. Los Informes corresponden a: (a) doce (12) escuelas incluidas por el Asegurador en la Tabla 1 de la Oposición; (b) diez (10) escuelas incluidas por el Asegurador en la Tabla 2 de la Oposición; y (c) tres (3) escuelas no incluidas por el Asegurador en la Tabla 1 ni en la Tabla 2 de la Oposición.

13. Con relación a los Informes, el Asegurador le indicó a la OCS en la Oposición que el 22 de junio de 2023, recibió seis (6) de éstos, y el 27 de septiembre de 2023, recibió los diecinueve (19) restantes.

14. Lo anterior quiere decir que los Informes incluyen veinticinco (25) escuelas para las que tanto el Asegurador, como CAT, realizaron estimados de daños y para las que tienen discrepancias en la cuantificación de sus respectivos daños.

15. Mediante carta de 22 de diciembre de 2023, y luego de evaluadas las comunicaciones del Asegurador y el DE, junto con sus correspondientes anejos, la OCS notificó a ambos que concluyó que, a la luz de las disposiciones de la Ley 242-2018 y la Normativa, escuelas contenidas en la Tabla 1 y en la Tabla 2 de la Oposición cumplían con los requisitos para llevar a cabo el proceso de valoración. Asimismo, la OCS concluyó que, ante la solicitud de valoración presentada por el DE, el Asegurador venía obligado a someterse al proceso de valoración de conformidad con la Ley 242-2018.

16. La OCS, en la carta de 22 de diciembre de 2023, apercibió a ambas partes a que, en un término de quince (15) días calendario contados desde la fecha de notificación de la carta, cumplieran con el nombramiento y notificación mutua de los tasadores que les representarán en el proceso de valoración solicitado por el DE.

17. De igual manera, la OCS le notificó al DE y al Asegurador que, en caso de que los tasadores nombrados por éstos no llegaran a algún acuerdo de buena fe para resolver las discrepancias sobre valoración de daños o pérdidas, ni en la designación de un árbitro independiente, que así lo notificaran a la OCS para designar un árbitro para esos fines.

18. Mediante carta de 8 de enero de 2024, el Asegurador se opuso a someter la Reclamación al proceso de valoración dispuesto en la Normativa alegando que la determinación de la OCS adolecía de requisitos de debido proceso de ley.

19. En esta comunicación el Asegurador arguyó, entre otras cosas, que su oposición a la petición del DE de un proceso de valoración surgió porque "las condiciones previas (conditions precedent) de la póliza no se habían materializado", y porque entiende que lo ordenado por la OCS "cuartea el derecho de MIC a investigar y ajustar la reclamación conforme a la póliza, la CSPR, y ambas cartas normativas mencionadas". (En este escrito, el Asegurador menciona, además de la Carta Normativa, la Carta Normativa N-OE-05-58-93).

A tenor con lo anterior, la OSC razonó que, la Ley 242-2018 establece que las discrepancias entre el asegurador y el asegurado en cuanto al valor de una propiedad o la cuantía de una pérdida debe resolverse mediante el proceso de valoración, esto, conforme al Artículo 11.190 del Código de Seguros de Puerto Rico, Ley 242-2018.

Además, arguyó que la carta normativa CN-2019-248-D estableció los siguientes requisitos para solicitar la resolución de conflictos mediante el proceso de "appraisal":

1. Debe haber una reclamación presentada ante el asegurador.
2. El asegurador debe haber reconocido cubierta y efectuado una oferta de pago por los daños o pérdida reclamada.
3. Exista una disputa entre el asegurador y el asegurado relacionado con el valor de la pérdida o daños en una o más partidas de la reclamación, que surge de una póliza de seguros de propiedad comercial o personal.
4. No se haya iniciado un proceso de litigación ante los Tribunales de Justicia sobre la reclamación. De haberse iniciado un procedimiento judicial, será necesario que el Tribunal, ya sea por iniciativa propia o a solicitud de alguna de las partes, autorice referir la controversia sobre el valor de la pérdida o daños al proceso de "appraisal".

La OCS entendió que, a base de los documentos, la reclamación realizada por el DE cumple con los requisitos dispuestos en la Carta Normativa para las veinticinco (25) escuelas para las cuales existe tanto una oferta de parte de MIC como estimados mayores del DE. Sobre la alegación de MIC que es necesario realizarse las segundas inspecciones de las diecinueve (19) escuelas alegó que esta situación no es óbice para iniciar el proceso de valoración ante un árbitro imparcial. Razonó que estas inspecciones se pueden dar dentro del proceso de valoración de las partes ponerse de acuerdo o sea ordenado por el árbitro. Reafirma que procede el proceso de *appraisal* así como la imposición de las multas contra MIC.

De igual forma y en oposición, el 21 de febrero de 2024, MIC presentó oposición al escrito de OCS. El 27 de febrero de 2024, el Comisionado de Seguros declaró con lugar la solicitud del DE y reiteró la imposición de multas contra MIC.

En desacuerdo con la determinación, el 8 de marzo de 2024, MIC presentó *Solicitud de Reconsideración de Resolución*[15]*,* la cual

---

[15] *Íd.*, págs. 16-51 del recurso.

no fue atendida por la OCSPR. El 11 de marzo de 2024, el DE también presentó *Moción de Reconsideración*[16].

Inconforme aún, el 25 de abril de 2024, MIC acudió ante esta Curia mediante recurso de *Revisión Judicial* y esbozó los siguientes señalamientos de error:

> PRIMER ERROR: El Comisionado erró al resolver la controversia de manera sumaria sin tomar en consideración los argumentos esbozados por MIC en su solicitud de resolución sumaria, y en la oposición a la solicitud de resolución sumaria presentada por la OCS.

> SEGUNDO ERROR: Erró el Comisionado de Seguros al adjudicar conceder la moción de resolución sumaria presentada por la OCS, y así adjudicando derechos privados en favor del DEPR, en base a una regla no-legislativa que no tiene fuerza de ley.

> TERCER ERROR: La determinación del Comisionado es errada dado que su aplicación constituye un menoscabo en la relación contractual ent[r]e el DEPR y MIC sin un debido proceso de ley.

> CUARTO ERROR: Erró el Comisionado al emitir su resolución apartándose de las reglas aplicables de hermenéutica legal.

> QUINTO ERROR: Erró el Comisionado al determinar que MIC violentó las disposiciones del CSPR y al multarlo por alejadamente[alegadamente] haber violentado una regla no-legislativa.

> SEXTO ERROR: El Comisionado erró al declarar sin lugar la moción de sentencia sumaria presentada por MIC, pues, no hubo oposición a ella, y presenta una interpretación correcta que está en armonía con las cartas circulares aplicables de la OCS.

Con el beneficio de la comparecencia de todas las partes, procedemos a exponer la normativa jurídica aplicable al caso ante nuestra consideración.

**II.**

**-A-**

El 27 de noviembre de 2018, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 242-2018[17] para mejorar la respuesta de la industria de seguros a la población asegurada. Esta ley enmendó

---

[16] *Íd.*, págs. 52-60 del recurso.
[17] 26 LPRA secc. 101.

los Artículos 11.150[18] y 11.190[19] y añadió un nuevo Artículo 9.301[20] a la Ley Núm. 77 de 1957, Código de Seguros de Puerto Rico. Según la Exposición de Motivos, esta ley busca codificar las protecciones a los consumidores que el derecho común provee y adoptar iniciativas innovadoras, en busca de una rápida y mejor respuesta de la industria de seguros para las víctimas de los huracanes Irma y María y en caso de ocurrir una futura catástrofe natural. De esta manera, establece herramientas legales adicionales que posibiliten una mejor respuesta de la industria de seguros a la población asegurada y contar con una industria mejor <u>capacitada para manejar las reclamaciones pendientes</u> y afrontar futuros eventos catastróficos.

La Ley Núm. 242-2018 posibilita el uso del proceso de valoración o "*appraisal*", para la resolución de conflictos en el pago de la cuantía correspondiente a reclamaciones de seguros de propiedad. El proceso de valoración o "*appraisal*" es un método donde las partes someten ante un árbitro imparcial los desacuerdos relacionados a la cuantía de una reclamación de seguros. Este es un método alterno diseñado para brindar una alternativa rápida y de carácter no-contenciosa, que facilite llegar a un acuerdo en el pago por el valor justo de la reclamación. La Sección 6 de la ley establece que comenzará a regir inmediatamente después de su aprobación.

Para poder implementar el Procedimiento de *Appraisal*, la Ley Núm. 242-2018 estableció que "[e]l Comisionado de Seguros tendrá facultad para adoptar las normas y reglas que estime necesarias para regular los procesos de valoración y los criterios de idoneidad y competencia de las personas que actúen como árbitros o tasadores en dicho proceso"[21].

---

[18] 26 LPRA secc. 1115.
[19] 26 LPRA secc. 1119.
[20] Ley Núm. 242-2018.
[21] 26 LPRA secc. 1119(3).

De acuerdo con lo establecido en la Sección 11.190(3) de la Ley Núm. 242-2018[22], el 20 de marzo 2019, la Oficina del Comisionado de Seguros emitió unas guías para regular el Procedimiento de *Appraisal* (Guías) denominada como Carta Normativa Núm. CN-2019-248-D. Estas guías, explican que la Ley Núm. 242-2018[23] reinstaló el uso de la cláusula de "*appraisal*" en las pólizas de seguros de propiedad comerciales y personales como método alterno para la resolución de controversias relacionadas con el valor de la pérdida o daños en una reclamación, siempre que no suplante o constituya una renuncia del derecho del asegurado a acudir a los tribunales.

Además, en lo concerniente a esta controversia, las Guías del Comisionado de Seguros aclaran que, aunque la Sección 6 de la Ley Núm. 242-2018 no alude a la aplicación retroactiva de las disposiciones del proceso de "appraisal", de su Exposición de Motivos se desprende la clara intención legislativa de hacer tales disposiciones de ley aplicables a las reclamaciones surgidas por los huracanes Irma y María que estén pendientes de resolver, aun cuando hayan sido presentadas antes de la aprobación de la ley[24].

**-B-**

La Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico[25]" (LPAUG), dispone en su sección 3.7:

> (a) Si la agencia determina que es necesario celebrar una vista adjudicativa, podrá citar a todas las partes o sus representantes autorizados e interventores, ya sea por su propia iniciativa o a petición de una de las partes, a una conferencia con antelación a la vista, con el propósito de lograr un acuerdo definitivo o simplificar las cuestiones o la prueba a considerarse en la vista. Se podrán aceptar estipulaciones, siempre que la agencia determine que ello sirve a los mejores intereses públicos.
> (b) Si la agencia determina a solicitud de alguna de las partes y luego de analizar los documentos que acompañan la solicitud de orden o resolución sumaria y los documentos incluidos con la moción en oposición, así como aquéllos que obren en el expediente de la agencia, que no es necesario

---

[22] *Íd.*
[23] *Íd.*
[24] *Con. Tit. del Condominio Acquamarina v Triple-S,* 210 DPR 344 (2022).
[25] 3 LPRA sec. 9647 (a).

celebrar una vista adjudicativa, podrá dictar órdenes o resoluciones sumarias, ya sean de carácter final, o parcial resolviendo cualquier controversia entre las partes, que sean separable de las controversias, excepto en aquellos casos donde la ley orgánica de la agencia disponga lo contrario[26].

La agencia no podrá dictar órdenes o resoluciones sumarias en los casos en que (1) existen hechos materiales o esenciales controvertidos; (2) hay alegaciones afirmativas en la querella que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la petición una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derechos no procede.

Es decir, "[n]ada impide que [la agencia] pueda adjudicar sin celebrar una vista evidenciaria cuando no exista controversia sobre los hechos y, además, toda la evidencia documental que surge del expediente señale claramente la corrección de la determinación de la agencia[27]".

Este mecanismo de disposición sumaria persigue "agilizar el proceso adjudicativo en casos en que no estén presentes los hechos materiales en controversia"[28]. De manera que, "[n]ada impide que una agencia pueda adjudicar sin celebrar una vista evidenciaria cuando no exista controversia sobre los hechos y, además, toda la evidencia documental que surge del expediente señale claramente la corrección de la determinación de la agencia"[29]. De este modo, se evita el tener que celebrar una "audiencia evidenciaria [que] no aportaría ningún elemento meritorio al proceso analítico"[30].

**-C-**

El Tribunal Supremo de Puerto Rico ha expresado en varias ocasiones que la sentencia sumaria es un remedio extraordinario y discrecional que sólo se debe conceder cuando no existe una controversia genuina de hechos materiales y lo que resta es aplicar el derecho[31]. En términos generales, al dictar sentencia sumaria, el tribunal deberá hacer lo siguiente:

---

[26] *OCS v. Universal*, 187 DPR 164, 177 (2012); *Torres Santiago v. Depto. Justicia*, 181 DPR 969, 991 (2011).

[27] *Mun. de San Juan v. CRIM*, 178 DPR 163, 179 (2010).

[28] *OCS v. Universal, supra*, pág. 177-178.

[29] *Íd.*, pág. 178.

[30] *OCS v. Universal, supra*, pág. 178, citando a J. Echevarría Vargas, *Derecho administrativo puertorriqueño*, San Juan, Ed. Situm, 2012, pág. 231.

[31] *Maldonado v. Cruz.*, 161 DPR 1, 39, (2004), *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964 (2022); *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981 (2023); *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601 (2023); *Birriel Colón v. Econo y Otros*, 2023 TSPR 120, 213 DPR ___ (2023) *Delgado Adorno v. Foot Locker Retail*, 208 DPR 622 (2022).

(1) analizar los documentos que acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal;

(2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos[32].

Analizados estos criterios, el tribunal no dictará sentencia sumaria cuando existan hechos materiales y esenciales controvertidos; cuando haya alegaciones afirmativas en la demanda que no han sido refutadas; cuando surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial, o cuando como cuestión de derecho, no procede[33]. La sentencia sumaria se puede dictar a favor o en contra de la parte que la solicita, según proceda en Derecho[34].

Por tratarse de un remedio discrecional, el uso del mecanismo de sentencia sumaria tiene que ser mesurado y solo procederá cuando el tribunal quede claramente convencido de que tiene ante sí documentos no controvertidos[35]. Es importante mencionar que, este Tribunal utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una moción de sentencia sumaria[36].

Los criterios que este foro intermedio debe tener presentes al atender la revisión de una sentencia sumaria son los siguientes:

1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*;

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

---

[32] *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004).
[33] *Íd.*, págs. 333-334.
[34] *Maldonado v. Cruz, supra.*
[35] *Íd.*, pág. 334.
[36] *Íd.*

4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia[37].

**-D-**

La Ley de la Judicatura del Estado Libre Asociado de Puerto Rico establece la autoridad del Tribunal de Apelaciones para revisar "decisiones, órdenes y resoluciones finales de organismos o agencias administrativas"[38]. Por su parte, la LPAUG establece el marco de revisión judicial de estas decisiones[39]. Cónsono con lo anterior, nuestra función revisora se limita a delinear la discreción de las entidades administrativas para garantizar que sus decisiones se encuentren en el marco de los poderes delegados y sean consecuentes con la política pública que las origina[40].

Debido a la vasta experiencia y conocimiento especializado que tienen las agencias administrativas sobre los asuntos que le son encomendados, los foros revisores les conceden gran consideración y deferencia a sus decisiones[41]. Es por esta razón, que la revisión judicial se limita a determinar si la agencia actuó de manera arbitraria o ilegal, o de forma tan irrazonable que sea considerado un abuso de discreción[42]. Hay que señalar que las determinaciones de los organismos administrativos están cobijadas por una presunción de corrección y legalidad que debe respetarse, mientras la parte que las impugne no demuestre con suficiente evidencia que la decisión no está justificada[43].

---

[37] *Roldan Flores v. M Cuebas*, 199 DPR 664, 679 (2018).

[38] Art. 4006(c) de la Ley Núm. 201-2003, 4 LPRA sec. 24(y)(c).

[39] Sección 4.5 de la Ley Núm. 38-2017, 3 LPRA sec. 9675.

[40] *Torres Rivera v. Policía de PR*, 196 DPR 606, 625-626 (2016); *Empresas Ferrer v. A.R.Pe.*, 172 DPR 254, 264 (2007); *Mun. de San Juan v. J.C.A.*, 149 DPR 263, 279 (1999).

[41] *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021); *OCS v. Point Guard Ins.*, 205 DPR 1005, 1026 (2020); *PRHOA v. Confederación Hípica*, 202 DPR 509, 521 (2019).

[42] *Pérez López v. Dpto. de Corrección*, 208 DPR 656, 673 (2022); *Super Asphalt v. AFI y otro, supra*, pág. 821; *Trigo Margarida v. Junta de Directores*, 187 DPR 384, 394 (2012).

[43] *Trigo Margarida v. Junta de Directores, supra*, 393-394; *Mundo Ríos v. CEE*, 187 DPR 200, 219 (2012), citando a *Rebollo v. Yiyi Motors*, 161 DPR 69, 77 (2004).

Así pues, la revisión judicial de una decisión administrativa se circunscribe a determinar si hay evidencia sustancial en el expediente para sostener la conclusión de la agencia o si esta actuó de forma arbitraria, caprichosa o ilegal[44]. El criterio rector es la razonabilidad de la actuación de la agencia recurrida[45]. Por ello, al momento de evaluar una determinación administrativa se debe considerar si: (1) el remedio concedido por la agencia fue apropiado; (2) la decisión de la agencia está sostenida en evidencia sustancial que obra en el expediente administrativo visto en su totalidad; y (3) las conclusiones de derecho fueron correctas[46].

Ahora bien, si la decisión del organismo administrativo no estuvo basada en evidencia sustancial; erró en la aplicación o interpretación de las leyes o los reglamentos que se le encomendó administrar; o actuó de manera irrazonable, arbitraria o ilegal, al realizar determinaciones carentes de una base racional; o si la actuación lesionó derechos constitucionales fundamentales, la deferencia debida a la agencia debe ceder[47].

Si una parte afectada por un dictamen administrativo impugna las determinaciones de hecho, esta tiene la obligación de derrotar con suficiente evidencia, que la determinación no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración[48]. De no identificarse y demostrarse esa otra prueba en el expediente administrativo, las determinaciones de

---

[44] *Vélez v. A.R.Pe.*, 167 DPR 684, 693 (2006).

[45] *Super Asphalt v. AFI y otro, supra*; *González Segarra v. CFSE*, 188 DPR 252, 276 (2013); *Trigo Margarida v. Junta de Directores, supra*, 394.

[46] *OEG v. Martínez Giraud*, 210 DPR 79, 89 (2022); *Rolón Martínez v. Superintendente*, 201 DPR 26, 35-36 (2018); *Pagán Santiago et al. v. ASR*, 185 DPR 341, 358 (2012).

[47] *OEG v. Martínez Giraud, supra*, pág. 90; *Super Asphalt v. AFI y otro, supra*, pág. 819, citando a *Torres Rivera v. Policía de PR, supra*, pág. 628; *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 712, 744-745 (2012).

[48] *González Segarra v. CFSE, supra*, pág. 277; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216-217 (2012); *Pereira Suárez v. Jta. Dir Cond.*, 182 DPR 485, 511 (2011).

hechos deben sostenerse por el tribunal revisor, pues el recurrente no ha logrado rebatir la presunción de corrección o legalidad[49].

Sobre las determinaciones de derecho, el Tribunal Supremo ha dicho que distinto a las determinaciones de hecho, el tribunal las puede revisar en todos sus aspectos, sin sujeción a norma o criterio alguno. Sin embargo, esto no quiere decir que un foro apelativo pueda descartar las conclusiones y sustituir el criterio del ente administrativo por el suyo. En estos casos, también los tribunales apelativos les deben deferencia a los organismos administrativos[50].

**III.**

En esencia, la recurrente arguyó que el foro primario erró al denegar su Reconsideración y mantener en vigor la determinación del 17 de enero de 2024, en donde el Comisionado de Seguros designa un tasador y le ordena a MIC dar cumplimiento estricto con lo dispuesto en el Artículo 11.190(3) del Código de Seguros de Puerto Rico[51] y la Carta Normativa CN-2019-248-D, para comenzar con el proceso de valoración. Como errores, aduce que incide el Comisionado de Seguros al no considerar los argumentos presentados por MIC en su moción de sentencia sumaria, la cual no fue objetada; erra en adjudicar derechos privados en favor del DE; así como al utilizar una regla no legislativa para resolver la controversia presentada, además, al no utilizar las reglas de hermenéutica en un contrato claro e imponer una multa improcedente en derecho.

A tenor con la normativa jurídica detallada, nuestra revisión de la Resolución Final es de *novo,* aunque limitada a la prueba

---

[49] *González Segarra v. CFSE, supra*; *Pereira Suárez v. Jta. Dir Cond.*, *supra*, pág. 513, citando a *Domínguez v. Caguas Expressway Motors, Inc.*, 148 DPR 387, 398 (1999); *O.E.G. v. Rodríguez*, 159 DPR 98, 118 (2003).

[50] *González Segarra v. CFSE, supra*, pág. 277-278; *Batista, Nobbe v. Jta. Directores, supra*, pág. 217, citando a *Rebollo v. Yiyi Motors, supra.*

[51] 26 LPRA 1119 (3).

documental presentada ante el Comisionado de Seguros[52]. Analicemos si la prueba que tuvo ante sí el Comisionado de Seguros era suficiente para determinar que procedía dictar resolución final, según solicitada por la OCS. De nuestra revisión de *novo* y el análisis realizado, conforme a lo dispuesto en la Regla 36 de Procedimiento Civil, *supra*, y su jurisprudencia interpretativa, encontramos que las partes cumplieron con los requisitos jurisprudenciales establecidos, así como también la *Resolución Final* del Comisionado de Seguros, en la cual se concluyó que no existen hechos materiales en controversia. Veamos.

El 27 de febrero de 2024, el Comisionado de Seguros emitió y notificó una *Resolución Final*[53] en la que declaró No Ha Lugar la *Moción de Resolución Sumaria* presentada por MIC. Determinó diecinueve (19) hechos como incontrovertidos, los que acogemos en nuestra Sentencia, cada uno sustentado por la prueba presentada en los recursos de MIC y OCS.

Atenderemos los errores primero y sexto conjuntamente. MIC argumenta como primer error, que el Comisionado de Seguros incide al no considerar los argumentos presentados en sus mociones dispositivas. No obstante, **no hace referencia específica a cuáles hechos y asuntos de derecho no fueron considerados**. Por lo cual, no hay *una discusión fundamentada, con referencia a los hechos y a las fuentes de derecho en que se sustenta, podrá el foro apelativo estar en posición de atender los reclamos que se le plantean*[54]. El primer error se tendrá por no puesto, por ser un error omitido o no discutido[55].

Referente al sexto error, aduce MIC que erró el Comisionado de Seguros al declarar sin lugar la moción de sentencia sumaria

---

[52] *Rivera Matos, et al v. Triple-S Propiedad, Inc. y ACE Insurance Company*, 204 DPR 1010 (2020).
[53] Véase págs. 1-15 del recurso.
[54] *Moran v. Martí*, 165 DPR 356, 365 (2005).
[55] *Íd.*

cuando no hubo oposición a ella. Es norma reiterada que, si la parte no presenta oposición a la moción de sentencia sumaria en el término provisto en esta regla, se entenderá que la moción de sentencia sumaria queda sometida para la consideración del tribunal, o en este caso, el foro administrativo, Regla 36.3(e) de Procedimiento Civil[56], y así lo resolvió el Comisionado de Seguros. Además, el defecto de una oposición a la moción de sentencia sumaria no equivale a la concesión automática del remedio solicitado. Ello, debido a que la concesión de la sentencia sumaria tiene que proceder conforme al derecho sustantivo aplicable[57]. Conforme con esos principios, el sexto error no fue cometido.

Por estar intrínsecamente relacionados, procederemos a discutir en conjunto el segundo y tercer error. Referente al segundo error, MIC alega que el Comisionado de Seguros erró con su determinación al aplicar una regla no-legislativa que no tiene fuerza de ley. Se arguye en el tercer error que la determinación constituye un menoscabo en la relación contractual.

Sobre el segundo error, nos reiteramos en la decisión del Tribunal Supremo en *Con. Tit. Acquamarina et. al v Triple S, supra*, a saber: ***La carta normativa CN-2019-248-D no crea obligación alguna, no afecta ningún derecho ni impone patrones de conducta. Es decir, no es una regla legislativa.*** *Todo lo contrario, la carta normativa solo pretende normalizar los procesos que puedan instarse al reclamar el mecanismo de appraisal. Su efecto es de naturaleza logística y procesal. Por ende, su aprobación no estaba supeditada al cumplimiento con los requisitos para la reglamentación de las Secs. 2.1–2.6 de la LPAU*[58].

---

[56] 32 LPRA Ap V, R 36.3(e).
[57] *Ortiz v. Holsum de P. R., Inc.*, 190 DPR 511, 525 (2014).
[58] *Con. Tit. del Condominio Acquamarina v Triple-S Propiedad, Inc., supra,* 374 (2022).

Es decir, la Resolución Final del Comisionado de Seguros al aplicar la Carta Normativa **_CN-2019-248-D_** cumple con la política pública establecida en la Ley Núm. 242-2018, la cual, en su Exposición de Motivos expone que, como parte de la política pública del Estado, esta ley busca establecer herramientas legales adicionales que posibiliten una mejor respuesta de la industria de seguros a la población asegurada y contar con una industria mejor capacitada **para manejar las reclamaciones pendientes** y afrontar futuros eventos catastróficos. Ante la dilación en el pago de las reclamaciones, producto principalmente de discrepancias entre el asegurado y asegurador en la cuantía de los daños o la pérdida correspondiente a la reclamación, la Ley Núm. 242-2018 posibilita el uso del proceso de valoración o *"appraisal"*, para la resolución de conflictos en el pago de la cuantía correspondiente a reclamaciones de seguros de propiedad.

Coincidimos con el Comisionado de Seguros al determinar que, tanto MIC como OSC coinciden sobre *las veinticinco (25) escuelas en cuestión, existe una reclamación debidamente presentada, que ha habido una oferta por parte del asegurador y que el Departamento de Educación le ha comunicado su inconformidad con dichas ofertas, presentándole para ello estimados que sobrepasan los del Asegurador*[59]. **_Estos hechos no controvertidos contienen los requisitos para que pueda iniciar un proceso de valoración_**[60]. La Ley Núm. 242-2018 establece, además, que el proceso de valoración o *"appraisal"* es un método en el que las partes someten ante un árbitro imparcial los desacuerdos relacionados a la cuantía de una reclamación de seguros. También se precisa que es un procedimiento alterno de resolución de conflictos, comúnmente usado en los demás estados de los Estados Unidos,

---

[59] Página 12 del recurso.
[60] *Íd.*

que no suplanta o sustituye el derecho del asegurado a iniciar un procedimiento administrativo o una acción judicial en los tribunales. Este proceso está diseñado para brindar una alternativa rápida y de carácter no-contenciosa adicional, que facilite a las partes llegar a un acuerdo en el pago por el valor justo de la reclamación. Conforme con esos principios, el segundo error no fue cometido.

En cuanto al tercer error sobre el menoscabo de la relación contractual entre DE y MIC, este último argumenta que ordenar someterse al proceso de valoración es prematuro porque de las veinticinco (25) escuelas, solo seis (6) fueron inspeccionadas por ambas partes por segunda ocasión, luego que el DE presentase los informes de daños. Sin embargo, en las restantes diecinueve (19) escuelas no se ha realizado la segunda inspección porque los informes preparados por el DE sobre daños fueron entregados tardíamente.

Ante esta alegación, el Comisionado de Seguros resuelve: ***Una segunda inspección, individual o de manera conjunta, si bien puede ser un trámite razonable para la resolución final de la reclamación, no es un requisito para que se inicie el proceso de valoración***. *De hecho, bien es algo que ocurre dentro del proceso de valoración una vez ordenado por el árbitro. No hay duda de que el Asegurador ha tenido la oportunidad de investigar y ajustar la reclamación en cuanto a las referidas veinticinco (25) reclamaciones, lo cual queda demostrado ante el hecho de que el Asegurador, en efecto, ha hecho ajustes y ofertas de pago en cuanto a las mismas*[61].

Reiteramos la determinación del Tribunal Supremo, a*l evaluar una presunta interferencia estatal con la contratación privada, debe auscultarse si, en efecto, existe una relación contractual y si el*

---

[61] *Íd.*

*menoscabo sufrido por la relación es severo. Además, de entenderse que el menoscabo es sustancial, debe evaluarse si la acción del Gobierno responde a un interés legítimo y si está racionalmente relacionada con la consecución de ese interés. A fin de cuentas, se trata de un balance entre el interés social en promover el bien común y el interés, igualmente social, de proteger las transacciones contractuales contra la aplicación arbitraria e irrazonable de las leyes*[62].

Sobre el particular*,* el Comisionado de Seguros evaluó el presunto menoscabo al aplicar de conformidad la normativa establecida por nuestra Alta Curia. Por lo cual, el segundo error no fue cometido.

En el cuarto error, MIC esboza que el Comisionado de Seguros incide al emitir la resolución final debido a que se apartó de las reglas de hermenéutica legal. Aduce que la conclusión en la resolución final se aparta de las normas e interpretación de la póliza.

Al respecto, el Código de Seguros dispone en su Art. 11.250 que "[t]odo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta"[63]. No obstante, el Tribunal Supremo ha reiterado que los contratos de seguro son de adhesión, pues es el asegurador quien lo redacta en su totalidad[64]. Cónsono con ello, las disposiciones de un contrato de adhesión se interpretan libremente en favor del asegurado[65]. Sin embargo, tal precepto no opera cuando las cláusulas en controversia son claras y libres de ambigüedad[66].

---

[62] *Con. Tit. Acquamarina et. al v Triple S, supra*, págs., 364-365 (2022).
[63] 26 LPRA secc. 1125.
[64] *Feliciano Aguayo v. MAPFRE,* 207 DPR 138, 149 (2021)
[65] *Maderas Tratadas v. Sun Alliance et al.*, 185 DPR 880, 898-899 (2012).
[66] *Íd.*, pág. 899.

La interrogante es, cómo compagina el precepto de interpretar los términos y condiciones de la póliza en un contrato de adhesión con cláusulas claras con el mandato que expresa el Código de Seguros inciso (3) del Art. 11.150 del Código de Seguros de Puerto Rico[67], sobre que: *toda póliza de seguros de propiedad, en la línea de negocios comercial o personal, deberá contener una estipulación o cláusula que disponga para la resolución de disputas relacionadas con el valor de la pérdida o los daños en una reclamación a base del proceso de "appraisal" (valoración). Esto, a opción del asegurado y sin que limite la facultad del asegurado de acudir a los tribunales o a algún foro administrativo directamente.*

*A su vez, el Art. 11.190 del Código de Seguros nos ilustra sobre lo que implica, en términos prácticos, este procedimiento recién adoptado. A esos fines, indica que el proceso de appraisal es un mecanismo "para resolver desacuerdos exclusivamente relacionados con el valor de una pérdida o daños en una o más partidas de la reclamación en pólizas de seguros de propiedad en la línea comercial o personal". Consecuentemente, y sin perjuicio de que el asegurado pueda iniciar una acción en los tribunales, se considera válida una estipulación o cláusula "que disponga que **cualquiera de las partes podrá solicitar por escrito someter ante un árbitro imparcial y competente la resolución de disputas, en torno a la valoración de daños o pérdida en una reclamación** en que el asegurador haya aceptado que está cubierta"[68].*

No cabe duda de que el Comisionado de Seguros armoniza las regulaciones establecidas en el Código de Seguros con la redacción e interpretación de la póliza, así pues, al ordenar que se comience el proceso de valoración ante un árbitro no existe un menoscabo contractual. Este cuarto error no fue cometido.

---

[67] 26 LPRA secc. 1115(3).
[68] *Con. Tit. Acquamarina et. al v Triple S, supra*, pág. 374.

En síntesis, MIC argumenta como quinto error que, se le impuso una multa por la cantidad de cinco mil dólares ($5,000.00) por alegada violación al Artículo 11.190 (3) del Código de Seguros[69] y cinco mil dólares ($ 5,000.00) adicionales por quebrantar la carta normativa ***CN-2019-248-D.*** Asevera que, las multas son improcedentes porque no contravino disposición alguna y el procedimiento que incoaron debe considerarse como parte del debido proceso de ley, para agotar los remedios administrativos de una controversia novel.

El Artículo 2.250[70], regula las penalidades que puede imponer el Comisionado de Seguros. En específico, son a*quellas violaciones a las disposiciones de este Código y de las <u>reglas o reglamentos</u> promulgados que no tuvieren penalidad prescrita en este Código, estarán sujetas a una multa administrativa no menor de quinientos (500) ni mayor de diez mil (10,000) dólares por cada violación.* Así pues, respecto a la multa de cinco mil dólares ($5,000.00) en violación al Código de Seguros, razonamos que la parte recurrente no apuntó a prueba adicional que derrotara la determinación del foro administrativo, ni prueba que demostrara que la agencia actuó de manera arbitraria o caprichosa, al imponer dicha multa.

No empece a lo anterior, la imposición de la multa de cinco mil dólares ($5,000.00) por quebrantar la **carta *normativa CN-2019-248-D*** excedió los parámetros de la LPAUG[71].

El Tribunal Supremo, al interpretar la LPAUG, ha identificado dos tipos de reglas que pueden surgir en el quehacer administrativo, a saber: las reglas legislativas y las reglas no legislativas. *Son reglas legislativas las que crean derechos, imponen obligaciones y*

---

[69] 26 LPRA secc. 1119.

[70] 26 LPRA secc. 257.

[71] Sección 7.1. — Multas Administrativas. (3 LPRA § 9701). Toda violación a las **leyes que administran las agencias o a los reglamentos** emitidos al amparo de las mismas podrá ser penalizada con multas administrativas que no excederán de cinco mil (5,000) dólares por cada violación.

*establecen patrones de conducta*[72]. Por el contrario, *las reglas no legislativas constituyen pronunciamientos administrativos que no alteran ni los derechos ni las obligaciones de los individuos*[73].

Como mencionamos previamente, nuestra Alta Curia determina que ***la carta normativa CN-2019-248-D no crea obligación alguna, no afecta ningún derecho ni impone patrones de conducta. Es decir, no es una regla legislativa***[74]. Por consiguiente, la multa impuesta por la violación a esta carta circular es improcedente. No queda más que ordenar que se modifique la *Resolución Final* conforme hemos explicado, con todas las consecuencias legales que esas modificaciones implican y, así modificada, se confirma.

## IV.

Por los fundamentos que anteceden, los que hacemos formar parte de esta Sentencia, se modifica la *Resolución Final* impugnada, para dejar sin efecto la multa de $5,000.00 impuesta a MIC a base de la carta normativa CN-2019-248-D, conforme antes hemos expresado y, así modificada, se *confirma*.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[72] *Sierra Club et al. v. Jta. Planificación*, 203 DPR 596, 605 (2019).
[73] *Mun. De Toa Baja v DRNA*, 185 684, 696 (2012).
[74] *Con. Tit. Acquamarina et. al v Triple S,* 210 DPR *supra*,374.